1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SNYDER ♦ DORENFELD, LLP
David K. Dorenfeld, (State Bar No. 145056)
Michael W. Brown, (State Bar No. 205380)
5010 Chesebro Road
Agoura Hills, CA 91301
Telephone:  (818) 865-4000
Facsimile:   (818) 865-4010
Emails: dkd@sd4law.com
        mwb@sd4law.com

CATHY JACKSON LERMAN, PA
Cathy J. Lerman
#118, 1440 Coral Ridge Drive
Coral Springs, FL 33071
Telephone: (954) 332-1143
Facsimile:  (954) 341-3568
Email: clerman@lermanfirm.com

BURSOR & FISHER, P.A.
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email: ltfisher@bursor.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STANLEY LEVINE, individually and on behalf of a class of similarly situated persons,<br><br>                    Plaintiff,<br><br>v.<br><br>MILLENNIUM TRUST  COMPANY, LLC,<br><br>                    Defendant. | Case No.:  12-CV-2210 JM -JMA<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

SNYDER ♦ DORENFELD, LLP

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-2210 JM-JMA

# I.  INTRODUCTION

1.      This is a class action lawsuit against Millennium Trust Company, LLC (the "Custodian,"  "Millennium Trust," or "Defendant") for making false and misleading representations that the investments made by Plaintiff and the Class Members were safe, profitable and legitimate when in fact the money invested by Plaintiff and the Class Members was being stolen by the individuals who urged them to invest (the "Fraud Promoters").

2.      For the reasons set forth below, Plaintiff and the Class Members invested their money into Self-Directed Investment Retirement Account ("SDIRAs").  A SDIRA is an individual retirement account ("IRA") held by a trustee or custodian that permits investment in a broader set of assets than is permitted by most IRA custodians.  It is estimated that approximately $94 billion was held in SDIRAs in the United States in 2011.

3.      Plaintiff and the Class Members were convinced to invest in the SDIRAs by Fraud Promoters, a term used by the SEC to describe individuals who devise and orchestrate Ponzi schemes to defraud innocent investors. The use of established companies like Millennium Trust provide a sense of legitimacy to an otherwise fraudulent investment scheme and help entice inexperienced investors to invest their money into the Fraud Promoters' fraudulent investments. The Fraud Promoters frequently emphasized the size and experience of the custodians as evidence of their credibility as investment advisers.

4.      The Fraud Promoters invested the money deposited by Plaintiff and the Class Members in their SDIRAs in "investments" that were fraudulent, illusory or non-existent. Millennium Trust aided and abetted the fraud by periodically sending out investment account statements showing extraordinary investment returns in the SDIRAs when in fact the Fraud Promoters were absconding or had already absconded with the victims' money.

5.      Millennium Trust was also obligated to report annually the fair market value of the SDIRAs.  Millennium Trust, however, failed to ascertain the actual value of the SDIRAs owned by

SNYDER ♦ DORENFELD, LLP

1   Plaintiff and the Class Members.  Instead, Millennium Trust reported the same value each year

2   unless the Fraud Promoters provided a greater value in which case Millennium Trust reported the

3   increased value to the victim.

4        6.        Millennium Trust knew that the Fraud Promoters were defaulting on loans, notes

5   and other "investments" included in the SDIRAs.  Nevertheless, Millennium Trust failed to

6   disclose that the Fraud Promoters were stealing the money invested by Plaintiff and the Class

7   Members, reporting to the victims the inaccurate and inflated amounts and values provided by the

8   Fraud Promoters, despite the knowledge that the money was gone.  Many of the victims lost their

9   entire life savings.

10

11                        **II.   JURISDICTION AND VENUE**

12       7.        The Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332

13  (d) (2) and the Class Action Fairness Act.  Plaintiff and certain Defendants are citizens of different

14  states. The amount in controversy exceeds $5,000,000, exclusive of interest and costs.

15

16       8.        This Court has personal jurisdiction over Defendant pursuant to, *e.g.*, 18 U.S.C. §

17  1965, the due process clause of the U.S. Constitution, and the Code of Civil Procedure § 410.10.

18  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's additional

19  claims arising under California state law for violation of, *inter alia*, California's Elder Abuse and

20  Dependent Adult Civil Protection Act (Welfare and Institutions Code § 15600, *et seq.*),

21  California's Unfair Competition law (Business and Professions Code § 17200, *et seq.*), and

22  California Corporations Code § 25000, *et seq.*

23

24       9.        Venue in this district satisfies the requirements of 28 U.S.C. §1391 (b) (1)-(2)

25  because Defendant and some Class Members reside in this jurisdiction.

26

27

28

SNYDER ♦ DORENFELD, LLP

### III.   THE PARTIES

10.     Plaintiff Stanley Levine ("Levine") is 85 years old and a resident of Newport Beach, California. Levine invested approximately $225,000 in a fraudulent enterprise resulting in a total loss of his investment.

11.     Defendant Millennium Trust is a privately held trust company chartered by the state of Illinois with its principal place of business in Oak Brook, Illinois and maintains an office in Carlsbad, California.  Millennium Trust touts itself as having over 170,000 accounts with total assets under custody exceeding $4.6 billion as of December 31, 2011.

12.     Certain other individuals and entities who were involved in the fraudulent enterprises that damaged Plaintiff and the Class Members are not sued because they are fugitives, under criminal investigation or already in prison or their assets are being pursued by a trustee/receiver, or further collection efforts would be fruitless.

### IV.   FACTUAL ALLEGATIONS

**A.     SDIRAs and the Role of the Custodian**

13.     The trustees and custodians of traditional IRAs are considered fiduciaries of the IRA account such that the trustees and custodians are responsible for maintaining and managing the securities in the IRA account, keeping track of distributions and dividend income, and making sure everything is done legally and correctly.

14.     SDIRAs are administered by custodians or trustees.  A stark contrast exists, however, between the "administration" performed by trustees and custodians of SDIRAs, as compared to the "administration and management" performed by the trustees and custodians of traditional IRAs.

15.     Investors in SDIRAs are permitted to invest in a variety of nontraditional investment options of their own choosing, including tax lien certificates, promissory notes, real estate,

SNYDER ♦ DORENFELD, LLP

businesses, and LLCs.  Traditionally few large investment companies or banks will administer

SDIRAs because of their complexity.

16.   Custodians of SDIRAs, however, deny any type of fiduciary responsibilities even

though they receive significant fees for administering an SDIRA.  In fact, the custodians employ

contracts of adhesion that seek to significantly limit their liability to their customers including

Plaintiff and the Class Members.

17.   Millennium Trust has made hundreds of millions of dollars while claiming to

"administer" SDIRAs that have resulted in many of their customers losing their entire life savings.

**B.     Millennium Trust Targeted Inexperienced Investors**

18.   Millennium Trust maintained company websites and engaged in extensive

marketing campaigns that targeted inexperienced investors with retirement savings accounts,

including 401ks and Roth IRAs, and provided investment advice and information about SDIRAs.

19.   To enhance the appearance of legitimacy of their services, Millennium Trust

sponsored Webinars, seminars and conferences about the safety, efficiency and profitability of

investing in SDIRAs.

**C.     The Investments Made by Plaintiff and the Class**

20.   Plaintiff and the Class Members invested in SDIRAs at the urging of the Fraud

Promoters.  Indeed, the Fraud Promoters could not have obtained the monies in the retirement

accounts of the Plaintiff and the Class members without using a SDIRA since that is the only

investment vehicle which permits unregulated, non-traditional investments.  The Fraud Promoters,

upon belief and information, include: Westmoore Management, LLC, Westmoore Investment, L.P.,

Westmoore Capital Management, Inc., Westmoore Capital, LLC, (collectively "Westmoore") and

Matthew Jennings ("Jennings"), CEO of Westmoore, who perpetuated a $53 million Ponzi

scheme/corporate shell game and was found guilty of securities fraud in August of 2011; Sean

Michael Mueller who operated a securities trading business/Ponzi scheme from 2000 until 2010

SNYDER ♦ DORENFELD, LLP

that bilked investors of over $147 million; Ward Onsa, a New York hedge fund manager who stole $3.1 million dollars primarily from retirees; and Delbert Huelle and Capital Funding Management whose Ponzi scheme management team included convicted felons.  These Fraud Promoters were not legitimate investment advisers but instead sought to defraud Plaintiff and the Class Members.

21.     In a class action suit pending in St. Claire County Circuit Court, Illinois entitled Sincoski v. Millennium Trust  Company, LLC (Case No. 12-L-277), the plaintiff asserted allegations regarding a Ponzi scheme known as the British Lending Program.  The plaintiff in Sincoski alleged that Millennium Trust became aware of the British Lending Program Fraud Promoters' wrongdoing before it was publicly disclosed.  Instead of notifying their SDIRA clients of the fraudulent investment scheme, Millennium Trust simply sent a letter to its British Lending Program SDIRA clients advising them that "due to administrative complexities" Millennium Trust had decided to resign as custodian of the SDIRAs for the British Lending Program without ever disclosing that Millennium Trust had actual knowledge that its SDIRA customers were the victim of a fraudulent investment scheme.

22.     The Sincoski Class Action Complaint further alleges that the British Lending Program victims did not learn about the fraudulent investment scheme until the federal indictment was unsealed against British Lending Program Fraud Promoters Martin Sigillito and Scott Brown in May of 2011.

23.     In a second suit pending in St. Clair County Circuit Court, Illinois, Cobb v. Millennium Trust Company, LLC, (Case No. 12-L-278) also arising out of the British Lending Program, plaintiffs Sharon Cobb and John Shahan allege that Millennium Trust knew in 2008 that the British Lending Program was a fraud and reported it to bank regulators but failed to disclose it to its own SDIRA customers who had invested with the British Lending Program. The plaintiffs in the Cobb case allege that Millennium Trust provided false account statements showing that their SDIRA funds had gone to the correct recipient but that was in fact false.  The Cobb plaintiffs also

SNYDER ♦ DORENFELD, LLP

1   allege that after Millennium Trust learned of the fraudulent investment scheme, Millennium Trust

2   permitted another $20M of its clients' SDIRA monies to be invested in the British Lending

3   Program fraudulent scheme.

4          24.    The Fraud Promoters mandated that Plaintiff and the Class Members invest through

5   SDIRAs.  The Fraud Promoters were acutely aware that their affiliation with and use of  SDIRA

6   custodians provided a sense of legitimacy to an otherwise fraudulent investment scheme and

7   enticed inexperienced investors, who might otherwise be more cautious, into an investment scam

8   because they believed they were protected by a large, purportedly well-funded company with a

9   trustworthy name like "Millennium Trust."

10         25.    To "sell" their victims, the Fraud Promoters frequently emphasized Millennium

11  Trust's size and experience as further evidence of the Fraud Promoters' strength and credibility as

12  a successful investment adviser and frequently indicated that investment scheme had been

13  "approved" by Millennium Trust thus creating a further air of legitimacy for the Fraud Promoter.

14         26.    The Fraud Promoters also knew that the SDIRAs of Plaintiff and the Class Members

15  were set up to automatically renew or "rollover" each year such that Plaintiff and the Class

16  Members could not liquidate their investments automatically at the end of the investment period

17  and, in fact, were not even notified at the end of any investment period that they could withdraw

18  their investment funds or "choose" to reinvest.

**Plaintiff Stanley Levine**

19         27.    Plaintiff Stanley Levine first became aware of a potential investment opportunity

20  with Fraud Promoter Matthew Jennings in 2007 through a client of Levine's accountant who

21  worked for Jennings.

22         28.    Levine met Jennings, the principal of Westmoore, and Jennings explained to Levine

23  that Westmoore had several subsidiary companies that provided a diverse range of investment

24  opportunities including property development, venture capital backing for high growth start-up

SNYDER ♦ DORENFELD, LLP

companies desiring to go public, and business management companies. Jennings told Levine that Westmoore investors were receiving 17-18% return on investment ("ROI").

29.     Levine learned about investing through a SDIRA with Westmoore from Jennings.

30.     In early 2009, Jennings informed the Westmoore investors, including Levine, that Westmoore like many other U.S. companies, was having liquidity issues due to the recession.

31.     Then in late April of 2009, Jennings advised the Westmoore investors, including Levine, that Westmoore was taking steps to improve its liquidity.  According to Jennings, Westmoore was merging all of the Westmoore subsidiary companies into public entities so that the Westmoore investors would ultimately receive shares of stock in publicly traded entities that could be sold to provide liquidity to the investors; and that Westmoore was looking at potential mergers with other companies as well as acquisitions to increase the liquidity of Westmoore .

32.      Jennings indicated that it could take up to 24 months for the various Westmoore entities to dispose of their assets and distribute shares of the underlying privately held entities to the Westmoore investors, including Plaintiff.

33.      Also in late April of 2009, Jennings advised the Westmoore investors that the SEC was investigating the closure of the Westmoore brokerage firm. However, Jennings indicated that Westmoore was cooperating fully with the SEC and that Westmoore management was optimistic as to the outcome of the SEC investigation of the Westmoore brokerage firm.

34.     Then, in December of 2009, Levine and the other Westmoore investors were advised by Jennings that Westmoore was in the process of implementing an asset distribution plan for its investors to provide liquidity.

35.     In February of 2010, Levine and the other Westmoore investors received an update from Jennings wherein Jennings advised that all Westmoore entities were being consolidated into one new company which would provide a "higher security interest" for all investors. In addition, Jennings indicated that Westmoore investors would have a choice of consolidating their

Westmoore investments into the new Westmoore entity being formed (which Jennings indicated would have a higher return on investment), or, in the alternative, Westmoore investors would be offered a "negotiated buyout" which would return the principle investment amount to the investors but would not include any interest or return on the investments.

36.    Jennings also told the Westmoore investors in February of 2010, that liquidation of the shares of the Westmoore investors would begin in March of 2010 and that some investors would be paid quarterly as small cash distributions became available until all Westmoore assets were liquidated as necessary to satisfy those investors who sought redemption of their investment. Jennings further indicated that he did not anticipate having to put Westmoore into bankruptcy because the formation of the new company consolidating all of the Westmoore entities would eliminate any need for Chapter 11 bankruptcy protection.

37.    In February of 2010, Jennings advised the Westmoore investors who invested through SDIRAs that they could not access any cash through their SDIRAs until the Westmoore private companies were able to liquidate certain assets and distribute cash to the SDIRA accounts.

38.    The lack of liquidity of the Westmoore investments in SDIRAs presented tax implications for Levine and other Westmoore investors over 70 and ½ years of age because these investors could not comply with IRS-mandated distributions as delineated below.

39.    In April of 2010, Levine and the other Westmoore investors received an update from Jennings indicating that Westmoore Holdings, Inc., one of the Westmoore affiliated investment companies, had changed its name to Rockwall Holdings, Inc. and had entered into a letter of intent to purchase an oil and gas land drilling service provider, Resource Energy.

40.    In May of 2010, Levine received an update from Jennings indicating that Rockwall Holdings, Inc.'s subsidiary, Bear Industrial Holdings, Inc. had year-to-date sales growth of almost 27% compared to the same four month period the prior year.

41.     On June 21, 2010, Levine executed the Millennium Trust documents necessary to transfer his Westmoore investment of $225,000 from his Charles Schwab ("Schwab") IRA to a Millennium Trust SDIRA and forwarded those documents to Millennium Trust.  Levine, through his Millennium Trust SDIRA, invested $100,000 in Westmoore Business LLC and $125,000 in Westmoore Lending LLC.  But in September of 2010, Levine's $100,000 investment in Westmoore Business LLC was moved to Westmoore Capital Group Series II.  That transfer was made without Levine's knowledge, let alone his consent or approval.

42.     On July 8, 2010, Levine received an email from a representative of Millennium Trust advising Levine that the representative was in the process of transferring his Schwab investment account in Westmoore to Millennium Trust. The Millennium Trust representative requested that Levine provide a contact number for Westmoore.

43.     Around the same time in late June or early July of 2010, Levine also learned that the SEC was seeking to freeze certain of the assets of Westmoore and appoint a receiver due to issues with Westmoore's liquidity.

44.     On or about June 30, 2010, Levine learned that Westmoore had retained a law firm to oppose the SEC's attempt to place Westmoore in receivership and that Westmoore investors were being asked to sign declarations supporting opposition to the SEC's actions.   Based on Jennings' representations and assurances, Levine believed that Jennings' plan to give investors shares of stock in privately held companies and cash from liquidation of Westmoore assets would satisfy any liquidity issues and therefore the appointment of a receiver was unnecessary.  Therefore Levine was happy to learn that Jennings and Westmoore was going to fight the SEC's attempt to put Westmoore into receivership.

45.     Millennium Trust claims that Levine notified Millennium Trust two weeks after the end of June of 2010 that Westmoore was under investigation.  Yet Millennium Trust continued to

SNYDER ♦ DORENFELD, LLP

process the transfer of Levine's Schwab IRA to Millennium Trust. Levine does not recall notifying Millennium Trust of any investigation concerning Westmoore.

46.    However, Levine received a letter from Millennium Trust dated July 19, 2010 indicating that Millennium Trust was aware that the SEC had filed an emergency court order to freeze the assets of Jennings and four of his companies. But the Millennium Trust letter only named Westmoore Investment LP as one of the entities being investigated by the SEC. The Millennium Trust letter also stated that the SEC had alleged that Jennings and four of his companies were operating a "Ponzi-like" scheme. Millennium Trust advised Levine in the letter that once they became aware of any additional important information concerning Levine's IRA's investment, they would contact Levine.  Levine reviewed the letter from Millennium Trust but did not know which of the several Westmoore entities were being investigated other than Westmoore Investment LP. But Levine assumed this investigation was part of the SEC investigation of the Westmoore brokerage company and the SEC's attempt to force Westmoore into receivership that Jennings had already disclosed. Levine never received any further communications from Millennium Trust about the SEC investigation of Westmoore and Jennings other than this July 2010 letter even though Millennium Trust collected fees from Levine from 2010 until 2012.

47.    On July 27, 2010, Levine received another email from Millennium Trust requesting that Levine provide a contact number for Westmoore so that Millennium Trust could transfer the funds from Schwab to Millennium Trust.

48.    On July 30, 2010, Millennium Trust transferred the assets of Levine's IRA with Schwab, which were investments in Westmoore Lending, LLC and Westmoore Capital Group II, LLC, to Millennium Trust which Millennium Trust recorded at a market value of $224,999.00.

49.    Levine received an account statement from Millennium Trust for the third quarter of 2010 reflecting that the transfer of funds from his Schwab IRA account to his Millennium Trust SDIRA had been completed and that Levine had been charged $300 by Millennium Trust for its

SNYDER ◆ DORENFELD, LLP

annual fee.  In that Millennium Trust account statement, the balance of Levine's Millennium Trust SDIRA as of September 30, 2010 was $374,999.00 but, in fact, Levine's money had been stolen years earlier.

50.     Levine's September 30, 2010 Millennium Trust SDIRA account statement did not define or identify the asset or assets being held by Levine's Millennium Trust SDIRA but simply referred to the SDIRA assets as "alternative investments." The September 30, 2010 Millennium Trust SDIRA account statement valuing Levine's SDIRA at $374,999.00 is the last Millennium Trust SDIRA statement Levine received until he called Millennium Trust in 2012 and requested additional SDIRA statements for 2011.  Yet Millennium Trust continued to charge Levine their SDIRA Custodian fees and costs through 2012 for a Millennium Trust SDIRA that Millennium Trust knew was worthless but Levine did not.

51.     Thereafter, Levine received a letter in December of 2011 from a court-appointed receiver for Westmoore advising Levine that the SEC was shutting down all of the Westmoore entities and that the Westmoore entities were being forced into receivership pursuant to a court order entered in August of 2011. The permanent receiver who was appointed for the Westmoore entities advised the investors, including Levine, that as of the date of the letter on December 16, 2011, it was unknown how much money would be available for distribution to Westmoore creditors and investors.

52.     In June of 2012, Levine decided to contact Millennium Trust about his SDIRA. Levine had received a SDIRA statement from Millennium Trust indicating that his Millennium Trust SDIRA had been closed in January of 2012.  As with prior actions by Millennium Trust, this closure was done without Levine's knowledge, let alone his consent or approval.

53.     Levine called the Millennium Trust customer service number and spoke with "Marsha" who told Levine that Millennium Trust should never have opened Levine's SDIRA because Millennium Trust never received the documents establishing what assets were being held

1   in Levine's SDIRA.  Levine then asked Marsha why Levine had been paying custodial

2   administration fees to Millennium Trust for a couple of years as the custodian for his SDIRA when

3   he did not have a Millennium Trust SDIRA and Marsha replied that she did not know the answer.

4         54.     Marsha also told Levine that she did not know what to do about his Millennium

5   Trust SDIRA and would have to call him back.  Levine then asked Marsha for a copy of his

6   Millennium Trust SDIRA statements for 2011.  Levine never heard back from Millennium Trust or

7   Marsha after that call but Levine did receive his 2011 Millennium Trust SDIRA account

8   statements.

9         55.     Levine's 2011 annual Millennium Trust SDIRA account statement, which Levine

10  requested and received in 2012, indicated that Levine's SDIRA held "securities" with a negative

11  value of $374,999.00 and a year-end market value of zero that had been devalued by Millennium

12  Trust on November 7, 2011 even though fees were collected by Millennium Trust until 2012.

13        56.     In addition, Levine's Millennium Trust SDIRA account statement for the third

14  quarter of 2011, which Levine requested and received in 2012, stated that his assets were

15  transferred to Millennium Trust on November 7, 2011.  However, the Millennium Trust SDIRA

16  statement also specified for each transfer, "ASSET SHOULD NOT HAVE BEEN

17  TRANSFERRED."

18        57.     To this day, Levine has never found out what happened to his SDIRA assets, how or

19  why Millennium Trust issued statements showing that Levine's retirement accounts had been

20  consolidated into his Millennium Trust SDIRA  and/or what assets were held in Levine's SDIRAs.

SNYDER ♦ DORENFELD, LLP

1

**D.    Millennium Trust Aided and Abetted the Fraud**

2

58.    Millennium Trust's conduct enabled, aided, abetted and facilitated the theft of the

3

investment monies of Plaintiff and the Class Members who were targeted by the Fraud Promoters.

4

59.    The monies deposited into SDIRAs "administered" by Millennium Trust were

5

6

stolen from Plaintiff and the Class Members through fraud, Ponzi schemes, and other criminal

7

conduct.

8

60.    Millennium Trust knew that the Fraud Promoters were stealing the money invested

9

by Plaintiff and the Class Members.

10

61.    In fact, Millennium Trust through its administration of the SDIRAs created the

11

illusion that the SDIRAs of Plaintiff and the Class Members were profitable and legitimate.

12

62.    Upon information and belief, Millennium Trust failed to ascertain whether Levine's

13

Millennium Trust SDIRA held title to the Westmoore assets that were transferred to Millennium

14

15

Trust from Charles Schwab.

16

63.    Millennium Trust is required by law to report the fair market value ("FMV") of the

17

SDIRA assets annually on IRS Form 5498 and to report the value of any distributions to the

18

SDIRA owner on Form 1099-R.  Millennium Trust, however, failed and refused to ascertain the

19

20

FMV of the SDIRAs owned by Plaintiff and the Class Members through a "qualified, independent

21

third party."   Instead, Millennium Trust reported the same value year after year unless, of course,

22

the Fraud Promoters themselves provided a greater value to Millennium Trust, who then recorded

23

it as the updated value of the SDIRA and further deceived Plaintiff and the Class Members into

24

believing their investments were both secure and increasing in value..

25

64.    Upon information and belief, Millennium Trust illegally attempted to shift the

26

burden and delegate its responsibility as a SDIRA Custodian to determine the market value of the

27

assets held in Millennium Trust SDIRAs. In fact, Millennium Trust illegally shifted the

28

responsibility and authority to value the assets in Millennium SDIRAs to Fraud Promoters like

SNYDER ♦ DORENFELD, LLP

SNYDER ♦ DORENFELD, LLP

Matthew Jennings so that Millennium Trust could continue to charge and accept fees from Levine and other class members.

66.     On information and belief, Millennium Trust failed and/or refused to comply or abide by the regulatory requirements applicable to Custodian of SDIRAs in the rendition of their "services" as Custodian to Plaintiff and the Class Members.

66.     Upon information and belief, Millennium Trust was on actual notice of the fact that the SEC was investigating Jennings and Westmoore; yet Millennium Trust failed and refused to verify the existence and title of the assets held in Levine and the other Class Member's Millennium Trust SDIRAs.  Millennium Trust also failed to determine the actual market value of the SDIRA assets, in light of its superior knowledge and sophistication and the lack of knowledge and sophistication of Levine about the status of the Westmoore assets held in Millennium Trust SDIRAs.

67.     Millennium Trust's letter in July of 2010 to Levine indicated that Millennium Trust knew a Ponzi scheme was being perpetrated by Jennings and Westmoore and confirmed that Millennium Trust would assist Levine by providing him with further information as to how that SEC investigation impacted his SDIRA as they learned it. However, despite having acknowledge that Levine's SDIRA was worthless and that Jennings and Westmoore had perpetrated a continuing investment fraud on Levine without Levine's knowledge, Millennium Trust was silent and concealed its superior knowledge of the implications of the SEC investigation of Jennings and Westmoore. This concealment led Levine to believe that his SDIRA assets were still viable and worth at least their investment value. As a result of its intentional nondisclosure, Millennium Trust facilitated, aided and abetted the investment fraud perpetrated by Jennings and Westmoore on Levine and the other Westmoore victims.

68.     Plaintiff and the Class Members reinvested their money in the fraudulent investments because they appeared to pay a much better return than any alternative investment

opportunity.  At least the investment returns appeared much better according to the misleading SDIRA account statements prepared by Millennium Trust.

69.     Millennium Trust also knew that the investment interest that purportedly was being earned in the SDIRAs of Plaintiff and the Class Members "appeared" in the account statement of the SDIRAs regardless of whether the accrued interest on the investment was actually deposited in the accounts owned by Plaintiff and the Class Members.  For the majority of victims, the accrued interest was not deposited.

70.     The IRS requires that IRA owners withdraw at least a minimum amount, known as a Required Minimum Distribution ("RMD") from their retirement accounts annually, starting the year an investor turns age 70 ½.  Thus, the RMD requirement demands that retirement assets have a certain degree of liquidity.  While RMDs may vary based on the ages of the investor and beneficiary, as well as the rate of return earned on the investment, RMD amounts on most retirement accounts are usually less than 1/20 of the principal in the retirement account.

71.     Millennium Trust had superior knowledge  that the investments of Plaintiff and the Class Members were completely illiquid and that the Fraud Promoters were misappropriating the money invested by Plaintiff and the Class Members.  As a result, the investment accounts frequently failed to maintain enough cash to pay RMDs.  Indeed, Levine and other elderly class members were never able to withdraw their RMD.  In addition, because the value of the SDIRAs were grossly inflated, so were the RMD amounts subjecting Millennium Trust's customers like Levine to greater penalties and/or tax consequences upon a failure to take the distribution.

72.     Although Millennium Trust charged significant fees for its "administrative services," it also failed to perform one of the few "duties" it acknowledges exists for custodians of SDIRAs: it is to maintain custody of the paperwork proving ownership of a designated asset by the SDIRA.

SNYDER ♦ DORENFELD, LLP

73. Millennium Trust failed and refused to maintain documents establishing the ownership of the assets in its customers' SDIRAs and, in fact, never accurately identified or verified the identity of the assets purportedly owned by the SDIRA of the Plaintiff and the Class Members.

74. Millennium Trust also permitted illegal transfers of SDIRA assets to bank accounts controlled by Fraud Promoters without the knowledge, permission or assent of the actual SDIRA account holder through incomplete and/or forged SDIRA documents.

75. It is common industry knowledge and some of the custodians have publicly acknowledged the fact that SDIRAs were being used by the Fraud Promoters to swindle investors. Despite that fact, Millennium Trust continued to market and affiliate with the Fraud Promoters after such was widely known in the industry and that such fraud was escalating.

76. Millennium Trust has publicly acknowledged that although it claims to be a "passive" custodian, it has stopped "allowing customers to invest" in some SDIRA programs upon discovering issues with certain investment promoters.

77. Upon information and belief, although Millennium Trust  classifies itself as a "passive custodian," its conduct appears to fall outside of a passive custodian role.

78. Upon information and belief, Millennium Trust acted outside of a passive custodian capacity by: jointly marketing its SDIRA custodial services with Fraud Promoters and other investment promoters; running background checks on investment promoters but refusing to disclose the results of the background checks to its affected customers even if it determined that the investment scheme was a fraud; despite having actual knowledge of a fraudulent investment scheme, failing to disclose the existence of the scheme to its affected customers or otherwise warn its customer; and continuing to process new investments through SDIRAs with certain investment promoters even though it had actual knowledge that the investment promoter was perpetuating a fraudulent scheme.

79.   The Fraud Promoters who swindled Plaintiff and the Class Members could not have pulled off these multi-million dollar scams without the direct assistance of Millennium Trust.

80.   The Fraud Promoters kept tight control over the direction of investments and creation of SDIRAs with Millennium Trust.  The Fraud Promoters wanted to make sure they controlled the investment and that communications with investors such as Plaintiff and the Class Members were consistent so that no suspicions were aroused.

81.   Millennium Trust aided, facilitated and supported the Fraud Promoters' control of the victims, so it could maintain a significant revenue stream for essentially doing nothing.

82.   In fact, Millennium Trust knew that the Fraud Promoters were defaulting on loans and notes in the SDIRAs owned by Plaintiff and the Class Members repeatedly over multiple years but turned a blind eye.  Millennium Trust's failure to accurately report the value of the SDIRAs of Plaintiff and the Class Members resulted in Plaintiff and the Class Members being unaware that their investment monies had actually been stolen, although their SDIRAs appeared to be increasing in value.

83.   Millennium Trust viewed and treated the Fraud Promoters as its partners and clients, not Plaintiff and the Class Members, which is why when the money ran out and the Ponzi schemes crumbled, Millennium Trust refused to provide assistance or help Plaintiff and the Class Members understand what happened to their investment money.

84.   Millennium Trust permitted the Fraud Promoter to provide the FMV of the assets of the SDIRAs of their victims but once the fraudulent scheme was exposed Millennium Trust required its customers to provide third party proof that the SDIRA was worthless and refused to modify the value of the SDIRA unless the victim/customer paid its administrative fees.

85.   Upon information and belief, Millennium Trust attempts, through its SDIRA custodian contract, to illegally shift its responsibilities as a SDIRA custodian to its customers, like Stanley Levine and the other Class Members. In fact, Millennium Trust's illusory, adhesion

SNYDER ♦ DORENFELD, LLP

contract permits Millennium Trust to amend its SDIRA custodial contract without the knowledge or consent of its customers; and Millennium Trust reserves the right in its SDIRA custodian contract to reject any beneficiary designations of the SDIRA owner.

86.     Upon information and belief, for SDIRAs with alternative assets, the Millennium Trust SDIRA custodian contract illegally mandates:  that it is the SDIRA owner's responsibility to provide Millennium Trust with the legally-required fair market value of the SDIRA assets  as of December 31st of each year; unlawfully permits Millennium Trust to obtain a fair market value for each SDIRA **from the investment entity itself** (meaning the Fraud Promoter in violation of applicable Treasury and IRS regulations and controlling law);  and that the SDIRA owner must indemnify and  hold Millennium Trust harmless for any losses relating to the fair market valuation of the SDIRA account.  Upon information and belief,  Millennium Trust's SDIRA custodian contract is so one-sided that it actually requires  the SDIRA owner to indemnify Millennium Trust even for its own negligence..

87.     Upon information and belief, the Millennium Trust SDIRA custodian contract permits Millennium Trust to:  increase its fees without the knowledge or permission of the SDIRA owner; to take monies from the SDIRA account to pay any and all Millennium Trust charges and fees without the knowledge or acquiescence of the SDIRA owner; and to sue the SDIRA owner in a court of competent jurisdiction for any and all SDIRA custodian fees;

88.     Millennium Trust gave Plaintiff and the Class Members a false sense of security by making false and deceptive representations that their "investments" would be safe, insured, accurately administered, and legally sound.  Plaintiff and the Class Members, relying on those representations, tendered their hard-earned money to Millennium Trust, while Millennium Trust enabled the Fraud Promoters to steal the monies invested by Plaintiff and the Class Members. Many investors lost their entire life savings.

# V.   CLASS ACTION ALLEGATIONS

89.     Plaintiff brings this action on their behalf and as a class action pursuant to Rules 23(a) and (b) (3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") defined as all persons or entities who invested in or held an investment through a SDIRA administered by Defendant Millennium Trust from January 1, 2006 until the present (the "Class Period") and that was offered, sold or solicited by the Fraud Promoters.

90.     Plaintiff also brings this action on behalf of a subclass (the "California Subclass") defined as all California residents who invested in or held an investment through a SDIRA administered by Defendant Millennium Trust from January 1, 2006 until the present and that was offered, sold or solicited by the Fraud Promoters.

91.     Plaintiff also brings this action on behalf of a subclass (the "California Senior Subclass") defined as all California residents over 65 years of age who invested in or held an investment through a SDIRA administered by Defendant Millennium Trust from January 1, 2006 until the present and that was offered, sold or solicited by the Fraud Promoters.

92.      The Class is so numerous that joinder of all Class Members is impracticable.  While the exact number of Class Members can only be determined by appropriate discovery, Plaintiff believes that the Class Members total over 500.

93.     Plaintiff's claims are typical of the claims of the other Class Members.  Plaintiff and all Class Members sustained damages as a result of Millennium Trust's unlawful course of conduct.

94.     Plaintiff will fairly and adequately protect the interest of the Class Members and have retained counsel competent and experienced in class action litigation.  Plaintiff has no interests that are contrary to or in conflict with those of the Class Members that Plaintiff seeks to represent.

SNYDER ♦ DORENFELD, LLP

95.     A class action is superior to other methods for the fair and efficient adjudication of this controversy.  The expense and burden of individual litigation make it virtually impossible for the Class Members individually to seek redress for the wrongful conduct alleged herein.

96.     Common questions of law and fact exist as to all Class Members and predominate over any questions solely affecting individual Class Members.  Among the questions of law and fact common to the Class are:

>    a.     Whether Millennium Trust made false and misleading representations to Plaintiff and the Class;
>
>    b.     Whether Millennium Trust engaged in financial elder abuse of Plaintiff Levine and the California Senior Subclass Members;
>
>    c.     Whether Millennium Trust has violated California's Unfair Competition Law;
>
>    d.     Whether Millennium Trust's acts constitute violations of the Dodd-Frank Wall Street Reform and Consumer Protection Act;  *See, e.g.,* 15 U.S.C. section 78u, *et seq.*;
>
>    e.     Whether Plaintiff and the Class Members have sustained damages as a result of the misconduct complained of herein, and, if so, the appropriate measure thereof.

97.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

98.     The names and addresses of Millennium Trust's customers who purchased its services during the Class Period are obtainable from information in the possession of Millennium Trust and/or its agents.  Notice can be provided to such owners via first class mail or e-mail using techniques and a form of notice similar to those customarily used in class actions.

SNYDER ♦ DORENFELD, LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SNYDER ♦ DORENFELD, LLP

## COUNT I

### CONVERSION

99.      Plaintiff incorporates the allegations contained in all of the prior paragraphs of this

Complaint as if restated and fully set forth herein.

100.      As described more fully above, the Fraud Promoters' "investment" programs that

Plaintiff and the Class Members invested in, were bogus.  Millennium Trust aided and abetted

Ponzi schemes and other fraudulent conduct that permitted the Fraud Promoters to exercise

unauthorized dominion and control over the property of Plaintiff and the Class Members.

101.      Millennium Trust's conversion has permanently deprived Plaintiff and the other

Class Members of their property, causing damage.

102.      Plaintiff and the Class Members have repeatedly demanded that their funds be

returned but Millennium Trust did not in fact return them.

103.      Millennium Trust's actions have directly caused injury and damages to Plaintiff and

the Class Members.

## COUNT II

### INTENTIONAL FRAUD

104.      Plaintiff incorporates the allegations contained in all of the prior paragraphs as if

restated and fully set forth herein.

105.      Millennium Trust made several misrepresentations to the public at large and to

Plaintiff and the Class Members as set forth above.  In particular, Millennium Trust sent account

statements to Plaintiff and the Class Members stating that the SDIRAs had significant value when

in fact the money had been stolen.  Millennium Trust also falsely stated that the "investments"

made by Plaintiff and the Class Members would be safe, insured, accurately administered, and

legally sound when in fact they were not.

106.      Millennium Trust knew that these statements were false when it made them.

FIRST AMENDED CLASS ACTION COMPLAINT                                                    21
CASE NO. 12-CV-2210 JM-JMA

107.    Millennium Trust intended for Plaintiff and the Class Members to rely upon its false statements.

108.    Plaintiff and the Class Members did rely on Millennium Trust's false statements, and would never have invested in and continued to invest in SDIRAs with Millennium Trust were it not for the false statements.

109.    Millennium Trust has enjoyed substantial financial gain, and Plaintiff and the Class Members have suffered severe financial loss, as a result of these false statements.

110.    Plaintiff further alleges that Millennium Trust's conduct has been malicious, fraudulent, oppressive and has been carried out with an intent to damage and cause harm to the Plaintiff and the members of the Class, and to harass, vex and annoy Plaintiff and the members of the Class.  Therefore, Plaintiff and the members of the Class are entitled to recover punitive damages in an amount appropriate to punish or make an example of Millennium Trust.

## COUNT III

## CONSPIRACY

111.    Plaintiff incorporates the allegations contained in all of the prior paragraphs as if restated and fully set forth herein.

112.    Millennium Trust was engaged in a conspiracy with the Fraud Promoters to obtain money and property from Plaintiff and the Class Members through fraudulent means, including the fraudulent misstatements alleged herein.

113.    Millennium Trust agreed to commit the unlawful acts set forth herein, and the other violations of the law which were intended to advance and which did in fact advance and facilitate the objectives of the conspiracy.

114.    Millennium Trust committed overt acts in furtherance of the conspiracy, including but not limited to the acts set forth above in part to induce Plaintiff and the Class Members to invest in fraudulent enterprises.

SNYDER ♦ DORENFELD, LLP

115.   Millennium Trust joined with the Fraud Promoters and planned together this fraudulent course of conduct.

116.   As a direct, proximate and readily foreseeable consequence of the conspiracy and the acts committed in furtherance thereof, Plaintiff and the Class Members have been harmed by the loss of their money and property.

117.   As a direct, proximate and readily foreseeable consequence of the conspiracy and the acts committed in furtherance thereof, Plaintiff and the Class Members have suffered substantial monetary damages in an amount to be proven at trial, and will continue to incur costs, expenses and legal fees as a result.

## COUNT IV

## VIOLATION OF CALIFORNIA'S ELDER ABUSE AND DEPENDENT ADULT CIVIL PROTECTION ACT (Welfare and Institutions Code § 15600, *et seq.*)

118.   Plaintiff incorporates the allegations contained in all of the prior paragraphs as if restated and fully set forth herein.

119.   Plaintiff asserts this cause of action on behalf of himself and the California Senior Subclass.

120.   Under California's Elder Abuse and Dependent Adult Civil Protection Act, Welfare and Institutions Code § 15600, *et seq.*, unscrupulous professionals or businesspersons, or persons posing as such may not financially exploit a senior (65 years of age or older) on the basis of their age, health or mental condition by overcharging for services or products and using deceptive or unfair business practices.

121.   Millennium Trust wrongfully took the monies and properties of Plaintiff and the Senior Subclass Members, who are 65 years of age or older, and intended to defraud them and unlawfully obtain possession of their retirement funds.

SNYDER ♦ DORENFELD, LLP

122.    Millennium Trust wrongfully took the property of Plaintiff and the California Senior Subclass Members.

123.    As a result of the wrongful conduct of Millennium Trust, Plaintiff incurred economic harm and losses.

124.    As a direct and proximate result of this wrongful conduct, Plaintiff sustained injuries.

125.    Plaintiff further alleges that Millennium Trust's conduct has been malicious, fraudulent, oppressive and has been carried out with an intent to damage and cause harm to the Plaintiff and the members of the Class, and to harass, vex and annoy Plaintiff and the members of the Class.  Therefore, Plaintiff and the members of the Class are entitled to recover punitive damages in an amount appropriate to punish or make an example of Millennium Trust.

## COUNT V

## UNFAIR COMPETITION

### (Business and Professions Code § 17200 *et seq.*)

126.    Plaintiff incorporates the allegations contained in all of the prior paragraphs as if restated and fully set forth herein.

127.    Plaintiff asserts this cause of action on behalf of himself and the California Subclass.

128.    California Business and Professions Code § 17200, *et seq.*, prohibits acts of "unfair competition," including any unlawful, fraudulent or deceptive business act or practice, as well as "unfair, deceptive, untrue or misleading advertising."

129.    This private Attorney General action is brought by Plaintiff to remedy violations of California's state consumer protection statutes arising out of Millennium Trust's and/or its representatives' misrepresentations, omissions of material facts, and breaches of agreements.

SNYDER ♦ DORENFELD, LLP

FIRST AMENDED CLASS ACTION COMPLAINT                                          24
CASE NO. 12-CV-2210 JM-JMA

130.    Millennium Trust, at all times material hereto, has engaged in "trade or commerce" by advertising, soliciting, offering or distributing a good or service by soliciting consumers within the definition of California Business and Professions Code § 17200 *et seq*.

131.    This is a private Attorney General action brought on behalf of the general public. As detailed herein, Millennium Trust has engaged in a pattern and practice of uniformly misrepresenting and/or repudiating its contractual and legal obligations.

132.    Millennium Trust's deliberate acts of fraud and misrepresentation accomplished through Ponzi schemes involving "investments" in illegal gambling activities, shell companies and ghost investment vehicles orchestrated by Millennium Trust without regard to Plaintiff's legal and equitable rights constitute acts of unlawful, unfair or deceptive business acts and practices that are injurious to the public within the meaning of California's Unfair Competition Law.

133.    The conduct of Millennium Trust is of a continuing nature that requires prompt relief.  Millennium Trust has uniformly represented to the general public through its representatives that its actions were legally appropriate when in fact they were not and/or it has concealed material facts (as detailed throughout this Complaint); and the disclosure of such information was necessary to make Millennium Trust's other representations not misleading for want of disclosure of such omitted facts or because Millennium Trust possesses superior knowledge of the true facts.

134.    Plaintiff and the California Subclass Members have suffered, and continue to suffer, actual injury in fact due to the willful acts of Millennium Trust that are contrary to the public policy of California, are substantially injurious to consumers of California and constitute unfair trade practices and competition under Section 17200, *et seq*. of the California Business and Professions Code.

135.    Based upon the obligations imposed upon Millennium Trust and its experience in the industry, Millennium Trust either knew, recklessly disregarded, reasonably should have known or were obligated under the law to provide correct and prompt information on the status of the

SNYDER ♦ DORENFELD, LLP

SDIRAs owned by Plaintiff and the Members of the California Subclass and notify them if said SDIRAs were in default.  Millennium Trust failed to do so.  As a result, Plaintiff and the California Subclass Members were subjected to unlawful, unfair and/or fraudulent treatment and Millennium Trust was unjustly enriched and should be ordered to pay restitution pursuant to Business and Professions Code §§ 17203 and 17204.

136.    Members of the general public also face irreparable harm, such as, *inter alia*, not being fully informed of the true facts, not having the full value of any monies wrongfully received or saved provided to them, having the status of their SDIRA wrongfully misrepresented, and/or the associated financial information as to the value of their investment being falsely reported.

137.    Equitable relief is appropriate to ensure adequate controls are in place to remedy the wrongful acts, prevent recurrence, and apprise the public of the true facts regarding what transpired.  Pursuant to California Business and Professions Code § 17203, Plaintiff is entitled to preliminary and permanent injunctive relief ordering Millennium Trust to cease this unfair competition, as well as disgorgement of all of its profits associated with this unfair competition.

138.    Plaintiff and the California Subclass Members seek an order from this Court prohibiting Millennium Trust from engaging or continuing to engage in the unlawful, unfair, or deceptive business acts or practices set forth in this Complaint and/or ordering that Millennium Trust perform its obligations under the law and reimburse Plaintiff and the Class Members all monies owed them as alleged in this Complaint.

139.    Plaintiff and the California Subclass Members additionally request an order from this Court requiring that Millennium Trust make restitution of profits and return or pay to Plaintiff and the California Subclass Members all of Millennium Trust's ill-gotten gains obtained from its illegal transactions and Ponzi schemes and/or pay restitution, including the amount of monies that should have been paid had Millennium Trust complied with its legal obligations, or, as equity requires.

140.     The above-described unlawful, unfair or fraudulent business acts and practices engaged in by Millennium Trust continue to this day and/or present a threat of irreparable harm to the general public.  Millennium Trust has failed to publicly acknowledge the wrongfulness of its actions and provide the complete relief required by the statute.

141.     Pursuant to California Business & Professions Code §17203, Plaintiff, on behalf of the general public, seeks a temporary, preliminary and/or permanent order from this Court prohibiting Millennium Trust from continuing to engage in the unlawful, unfair, or fraudulent business acts or practices set forth in this Complaint and from failing to fully disclose the true facts as set forth herein, and or ordering Millennium Trust or its representatives to stop misleading the public and engage in a corrective campaign, particularly in light of the public misperception created by Millennium Trust and/or its representatives' misstatements and omissions of material fact, as well as provide appropriate equitable monetary relief as the court deems just and appropriate to all persons with a vested interest therein.

142.     Plaintiff and the California Subclass Members further request a court order that an asset freeze or constructive trust be imposed over all monies in Millennium Trust's possession which rightfully belong to Plaintiff and the California Subclass Members.

143.     Plaintiff requests judgment and restitution and/or disgorgement from Millennium Trust in an amount to be proven at trial for the unfair, fraudulent and illegal business practices described herein.

**COUNT VI**

**<u>VIOLATION OF THE CONSUMER FINANCIAL</u>**

**<u>PROTECTION BUREAU'S REGULATIONS</u>**

**(15 U.S.C. section 78u, *et seq.*)**

144.     Plaintiff incorporates the allegations contained in all the prior paragraphs as if restated and fully set forth herein.

SNYDER ♦ DORENFELD, LLP

145.    Financial entities that engage in conduct that poses a risk to consumers as well as financial entities that engage in unfair, deceptive or abusive acts or practices are regulated by and subject to enforcement actions from the Consumer Financial Protection Bureau ("CFPB"), which was created by the Dodd-Frank Act, 15 U.S.C. section 78u, *et seq.*

146.    Millennium Trust herein materially interfered with  its customers' ability to understand a term or condition of a consumer financial product or service; took unreasonable advantage of its customers' lack of financial savvy; and precluded the customers' ability to protect themselves in the selection or use of consumer financial products or services.

147.    The aforementioned conduct by Millennium Trust constitutes unfair, deceptive and misleading practices by financial service firms within the meaning of the CFPB Rules.

148.    Plaintiff and the Class Members have suffered damages as a proximate result of Millennium Trust's violation of the CFPB rules.

**COUNT VII**

**<u>NEGLIGENT MISREPRESENTATION</u>**

149.    Plaintiff incorporates the allegations contained in all the prior paragraphs as if restated and fully set forth herein.

150.    Millennium Trust made several misrepresentations to the public at large and to Plaintiff and the Class Members as set forth above.  In particular, Millennium Trust sent account statements to Plaintiff and the Class Members stating that the SDIRAs had significant value when in fact the money had been stolen.  Millennium Trust also falsely stated that the "investments" made by Plaintiff and the Class Members would be safe, insured, accurately administered, and legally sound when in fact they were not.

151.    Millennium Trust should have known that these statements were false when it made them.

SNYDER ♦ DORENFELD, LLP

152.   Millennium Trust intended for Plaintiff and the Class Members to rely upon its false statements.

153.   Plaintiff and the Class Members did rely on Millennium Trust's false statements, and would never have invested through SDIRAs with Millennium Trust were it not for the false statements.

154.   Millennium Trust has enjoyed substantial financial gain, and Plaintiff and the Class Members have suffered severe financial loss as a result of their reliance on Millennium Trust's false statements.

155.   Plaintiff further alleges that Millennium Trust's conduct has been malicious, fraudulent, oppressive and has been carried out with an intent to damage and cause harm to the Plaintiff and the members of the Class, and to harass, vex and annoy Plaintiff and the members of the Class.  Therefore, Plaintiff and the members of the Class are entitled to recover punitive damages in an amount appropriate to punish or make an example of Millennium Trust.

## COUNT VIII

## <u>CONSTRUCTIVE TRUST</u>

156.   Plaintiff incorporates the allegations contained in all the prior paragraphs as if restated and fully set forth herein.

157.   As a proximate result of Millennium Trust's fraudulent and/or negligent misrepresentations and otherwise wrongful conduct as alleged herein, Plaintiff has sustained damages.

158.   By reason of the fraudulent and otherwise wrongful manner in which Millennium Trust obtained its alleged right, claim or interest in and to the property, Millennium Trust has no legal or equitable right, claim or interest therein.

SNYDER ♦ DORENFELD, LLP

159.   Instead, Millennium Trust is an involuntary trustee holding said property and profits therefrom in constructive trust for Plaintiff and the Class Members with the duty to convey the same to Plaintiff and the Class Members forthwith.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff, on behalf of himself and all others similarly situated, demands upon Millennium Trust for:

1.   An Order certifying the case as a class action;

2.   An Order appointing Plaintiff as the Class Representative of the Class, California Subclass and California Senior Subclass;

3.   An Order appointing undersigned counsel and their firms as counsel for the Class , California Subclass and California Senior Subclass;

4.   Compensatory damages, punitive damages, statutory penalties, restitution and/or disgorgement in an amount to be proven at trial;

5.   Injunctive relief;

6.   An order that a constructive trust be imposed over all monies in Millennium Trust's possession which rightfully belong to Plaintiff and/or an asset freeze of monies belonging to Millennium Trust;

7.   Attorney's fees, costs and expenses;

8.   Pre and post-judgment interest as allowed by law;

9.   An award of taxable costs; and

10.   Any and all such further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the Class Members, hereby demands a trial by jury as to all issues so triable as a matter of right.

SNYDER ♦ DORENFELD, LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SNYDER ♦ DORENFELD, LLP

Respectfully Submitted,

Dated:  November 5, 2012          BURSOR & FISHER, P.A.

By: _____ s/ L.Timothy Fisher _____
          *L. Timothy Fisher*

L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email: ltfisher@bursor.com

SNYDER ♦ DORENFELD, LLP
David K. Dorenfeld, (State Bar No. 145056)
Michael W. Brown, (State Bar No. 205380)
5010 Chesebro Road
Agoura Hills, CA 91301
Telephone:  (818) 865-4000
Facsimile:  (818) 865-4010

CATHY JACKSON LERMAN, PA
Cathy J. Lerman
#118, 1440 Coral Ridge Drive
Coral Springs, FL 33071
Telephone: (954) 332-1143
Facsimile:  (954) 341-3568

*Attorneys for Plaintiff*